**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ANGIE MEADOWS and CATHY LEONARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.   04-CV-0949-CVE-PJC |
| | ) | (Base File) |
| CENTURY HEALTHCARE, INC., an Oklahoma | ) | |
| Corporation; DILLON FAMILY & YOUTH | ) | |
| SERVICES, INC., an Oklahoma corporation, d/b/a | ) | |
| SHADOW MOUNTAIN INSTITUTE, MICHAEL | ) | |
| D. DUBRIWNY, M.D., and JERRY DILLON, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PHYSICIANS LIABILITY INSURANCE | ) | |
| COMPANY, an Oklahoma corporation, | ) | |
| | ) | |
| Garnishor/Plaintiff, | ) | |
| | ) | Case No. 05-CV-0590-CVE |
| and | ) | (Consolidated Case) |
| | ) | |
| ST. PAUL MERCURY INSURANCE COMPANY, | ) | |
| | ) | |
| Garnishee/Defendant. | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Motion for Summary Judgment and

Supporting Brief of Garnishor Physicians Liability Insurance Company ("PLICO") (Dkt. # 39);

Motion for Summary Judgment by Garnishee St. Paul Mercury Insurance Company ("St. Paul")

(Dkt. # 40); Motion for Summary Judgment by Defendant St. Paul Mercury Insurance Company and

Memorandum Brief in Support (Dkt. # 82); and Motion for Summary Judgment and Supporting

Brief on Equitable Subrogation and Equitable Contribution Claims of Plaintiff Physicians Liability

Insurance Company (Dkt. # 86).  PLICO has also filed a Motion in Limine and Supporting Brief

(Dkt. # 93) and a Motion to Strike St. Paul's Reply Brief and/or Strike from the Record Exhibit EEE Thereto and Exclude Use of Said Exhibit as Evidence in Case (Dkt. # 107).[1]

## Background

This action arose out of a medical malpractice action filed in state court by Angie Meadows and her mother, Cathy Leonard.  In 1986, Meadows was referred to the Shadow Mountain Institute ("SMI") for professional psychiatric treatment.  Based solely on an internal rotation used to allocate new patients, Michael Dubriwny, M.D., the SMI medical director, was assigned to treat Meadows. Dr. Dubriwny diagnosed Meadows with oppositional defiant disorder and treated Meadows with aggressive psychotherapy for seven months.[2]  Five years later, Meadows sought psychiatric treatment at the Laureate Psychiatric Hospital and, by random assignment, Dr. Dubriwny became her treating psychiatrist.  Leonard became concerned that her daughter needed to see a neurologist instead of a psychologist.  Leonard took Meadows to a neurologist, Jeannie Edwards, M.D., who diagnosed Meadows with a seizure disorder and ordered that Meadows be treated with medication instead of psychotherapy.  This treatment was successful.

---

[1]     PLICO's motion in limine (Dkt. # 93) is moot, because it requests the exclusion of specified evidence at trial.  Since the Court will be entering a final judgment based on the motions for summary judgment, it is not necessary to rule on the exclusion of evidence at trial.  With regard to PLICO's motion to strike (Dkt. # 107), the Court has already granted St. Paul permission to file a reply brief in excess of ten pages (Dkt. # 118) and the exhibit PLICO requests the Court to strike is relevant only to an issue collateral to insurance coverage.  Both motions are moot based on the Court's ruling in this Opinion and Order.

[2]     Dr. Dubriwny refused Leonard's repeated requests for neurological tests to rule out an organic cause for Meadows' behavior.  He made his initial diagnosis of oppositional defiant behavior on the first day of treatment and did not reconsider his diagnosis after seven months of treatment.  If Dr. Dubrinwy had ordered an EEG at his initial visit with Meadows, 228 days of invasive personal and family therapy would have been avoided.

On August 29, 1991, Meadows and Leonard filed the malpractice action against Dr. Dubriwny and SMI for misdiagnosis and improper treatment of Meadows.[3] Before trial, SMI moved for summary judgment on the basis that it was not a proper party.  The trial court granted summary judgment for SMI on all claims except plaintiffs' claim that SMI was vicariously liable for the actions of its apparent agent, Dr. Dubriwny.[4]  Under Oklahoma law, when a physician is held out to a patient as an agent of the hospital, the hospital "is estopped from denying responsibility for the alleged negligence of its ostensible agents."  Smith v. Saint Francis Hosp., Inc., 676 P.2d 279, 282 (Okla. Civ. App. 1983).  SMI agreed to stipulate to vicarious liability for Dr. Dubriwny's professional malpractice, if any, under a theory of apparent agency and the case proceeded to trial.

The jury was instructed that SMI could be held vicariously liable if it found Dr. Dubriwny was negligent.  SMI did not object to a jury instruction which stated: "The parties admit that Shadow Mountain Institute should be held liable for any negligence attributable to Dr. Dubriwny."  Dkt. # 39, Ex. 5, Trial Transcript, May 10, 2002, at 998.  SMI stipulated to liability only on the theory of apparent authority, as the trial court specifically limited SMI's liability to vicarious liability for Dr. Dubriwny's lack of due care when treating Meadows.  The jury returned verdicts in favor of plaintiffs: $1.5 million for Meadows and $1.2 million for Leonard.  With prejudgment interest

---

[3]     Leonard's claim against Dr. Dubriwny was based on the extensive family therapy that he ordered both Meadows and Leonard to undergo.  Leonard attended at least 30 family therapy sessions with her daughter.  Dr. Dubriwny diagnosed Meadows with enmeshment, an excessive level of closeness with her mother.  He ordered Leonard to attend family therapy for treatment with her daughter, to show that Leonard's treatment of Meadows was causing Meadows' oppositional defiant disorder.

[4]     The trial court's ruling on this issue was appealed to the Oklahoma Supreme Court, which ultimately affirmed the trial court's order.

included, the judgments totaled $5,218,215.  Dr. Dubriwny and SMI appealed the verdicts, but the Oklahoma Court of Civil Appeals affirmed.

After the appeal was final, Meadows and Leonard demanded payment of the verdicts from Dr. Dubriwny and his liability insurer, PLICO.  PLICO insured Dr. Dubriwny for medical professional liability arising out of his private practice.[5]  SMI carried liability insurance through St. Paul for its medical director for liability incurred within the scope of the medical director's administrative duties.  PLICO formally demanded that St. Paul pay its policy limits to help satisfy the judgment, but St. Paul refused.  PLICO paid Leonard $2,622, 215, and obtained a release and satisfaction of judgment.  PLICO paid Meadows $3,365,198, and requested an assignment of judgment from Meadows instead of a release and satisfaction.  PLICO claims that it is a judgment creditor of SMI because it received an assignment of Meadows' judgment.  St. Paul still refused to pay PLICO any part of the judgment, even though PLICO claimed it held a valid judgment against SMI.

PLICO instituted this garnishment action against St. Paul in state court and St. Paul removed it to federal court.  PLICO also asserts claims for equitable subrogation and equitable contribution. St. Paul filed two motions for summary judgment, arguing that the assignment of judgment was a legal nullity and that Dr. Dubriwny was not entitled to liability coverage under SMI's liability insurance policy when he acted in his capacity as a private practitioner.  PLICO has also filed two motions for summary judgment, arguing several theories in support of its claim that Dr. Dubriwny is covered under SMI's hospital professional liability policy underwritten by St. Paul.

---

[5]     PLICO's medical malpractice liability policy and St. Paul's hospital professional liability policy are discussed in greater detail below.

## Summary Judgment Standard of Review

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327 (citations omitted).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment.

Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**Undisputed Facts**

*Dr. Dubriwny*

SMI is a medical institution in Tulsa, Oklahoma, offering a variety of clinical services, such as a residential treatment program, children's hospital program, inpatient and outpatient medical treatment, and psychiatric services.  SMI is owned and operated by Dillon Family & Youth Services, Inc.  The Chief Executive Officer and majority shareholder of Dillon Family & Youth Services, Inc. is Jerry Dillon, who was responsible for hiring a medical director for SMI.  In 1986, Dillon hired Dr. Dubriwny as SMI's medical director.

When Dr. Dubriwny was originally hired as medical director for SMI, he signed an employment agreement with SMI.  The employment agreement clearly distinguishes between Dr. Dubriwny's position as medical director and his private practice of psychiatry.  Paragraph 9 of the agreement provides:

> SMI agrees that it will be legally responsible for all claims, causes of action, liabilities, attorneys fees, damages or costs of any kind arising from its own or its employees' negligent, tortuous [sic] or wrongful conduct in the establishment, operation or activities of SMI and its facilities with respect to the scope and performance of the employment hereunder by the employee in the position of SMI Medical Director.  The employee, Michael Dubriwny, agrees that he will be legally responsible for all claims, causes of actions, liabilities, attorneys fees, damages or costs of any kind arising from his own negligent, tortuous [sic], or wrongful performance of the services provided by him, as an individual practitioner of psychiatry, to inpatients, and outpatients not admitted to or patients of SMI, accepted by him as cases in his private practice of psychiatry, as authorized and described in Schedule A, to this Agreement, and that he will indemnify and hold harmless SMI from any and all such liabilities resulting from his private practice.

Dkt. # 98, Ex. RR, Agreement for Employment of Medical Director, at 3.

Paragraph 10 of the employment agreement requires Dr. Dubriwny to maintain professional liability insurance of at least $1 million per occurrence and $3 million in the aggregate to insure him when engaging in the private practice of psychiatry.  This provision clearly distinguishes between Dr. Dubriwny's role as medical director and his private practice:

> SMI and the professional employee, Medical Director, shall each maintain professional liability insurance from a reputable insurance carrier covering their respective activities at SMI, with limits of not less than One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate furnished by each to the other upon request.  This Agreement, in its entirety, is contingent upon the employee, as Medical Director, being an insurable risk for the limits of coverage required herein.  The cost of payment of the premium for such insurance coverage shall be as provided in Schedule A of this Agreement.

Id.  Schedule A further defines the duties of the medical director, dividing his duties into four general categories: (1) ensuring the quality of the clinical programs; (2) providing administrative supervision of the medical staff and other professional staff members; (3) evaluating current programs and aiding in development of new programs at SMI; and (4) actively participating in marketing activities at SMI.  Id. at 7-8.  The agreement permits Dr. Dubriwny to serve as medical director and to maintain a private practice under the following conditions:

> The professional employee, Medical Director, shall be permitted to conduct a private inpatient and outpatient psychiatric practice, with the primary office for the practice to be located at the employer's SMI facility.  The extent and case load of such permitted psychiatric practice shall be reasonable with respect to the substantial and best efforts required of the employee to perform his duties and responsibilities as SMI Medical Director in a satisfactory professional manner.

Id. at 9.  The employment agreement offers clear evidence that SMI intended to differentiate Dr. Dubriwny's roles as medical director and private practitioner.

The medical staff at SMI adopted bylaws to govern their conduct as physicians, and included several provisions relevant to Dr. Dubriwny's role as medical director.  The bylaws require the

governing board of SMI to appoint a medical director.  Part F delegates the following duties to the medical director:

(1) Be responsible to the Chief Administrative Officer for maintaining the quality of medical/psychiatric care within the Institute.  In an emergency, on behalf of the Governing Board, he shall have the authority to intervene in the medical care of any patient in the interest of the patient and to maintain the professional standards of the Institute.

(2) Advise the Chief Administrative Officer on medical problems and on questions of policy and public relations as they relate to medical/psychiatric practice.

(3) Act as advisor and consultant in unusual and difficult medical cases, when requested, and advise the medical staff on problems of a medical nature.

(4) Assist in establishing standards of medical care and investigate and study new developments in medical practice and techniques, advising the Chief Administrative Officer and and Medical Staff as to their adaptation to the Institute.

(5) Assist in the planning and establishing of such Institute milieu programs as may be necessary or beneficial to patients receiving care in the Institute.

(6) Conduct or direct therapy for patients as required.

(7) Cooperate with the treating physician in communicating to Institute personnel a unified treatment approach for each patient.

(8) Be responsible for the maintenance of medical/psychiatric standards of patient care to meet the requirements of the Joint Commission on Accreditation of Hospitals.

(9) Conduct conferences and committee meetings as requested by the Chief Administrative Officer.

(10) Plan for and participate in the instruction and supervision of Intern and Resident physicians.

(11) In cooperation with the Research Committee, review and make recommendations to the Chief Administrative Officer concerning all professional articles pertaining to Shadow Mountain Institute which are released for publication.

(12) Arrange for seminars or speakers of a medical/psychiatric nature.

(13) Represent the Institute in meetings of medical/psychiatric groups.

(14) Perform other duties as requested by the Chief Executive Officer or the Chief Administrative Officer.

(15) Works [sic] closely with training coordinator to suggest needed areas of staff development.

Dkt. # 39, Ex. 17, Bylaws of the Professional Staff of Shadow Mountain Institute, at 18-19.  The medical director primarily occupies an administrative position, with occasional oversight of patient care when required.  The purpose of the bylaws is to "govern the actions of members of the professional staff," and these rules are simply a method of self-government by the medical staff.  Id. at 2.  However, Dr. Dubriwny's employment agreement references the bylaws, and it requires him to fulfill any duties imposed by the medical staff in addition to any duties required by SMI.

*The Insurance Policies*

The terms of the two insurance policies are central to the outcome of the case.  PLICO insured Dr. Dubriwny for acts of medical negligence occurring during treatment of patients in his private practice.  PLICO agreed to provide medical malpractice insurance to Dr. Dubriwny for:

all sums which the insured shall become legally obligated to pay as damages, within the applicable limits of the policy, because of injuries occurring during the policy period and arising out of the practice of the insured's profession described in the declarations including the rendering or failure to render professional services by the insured, or by any person for whose acts or omissions the insured is legally responsible, including:

A.    Service by the insured as a member of a medically related accreditation or similar professional board or committee on which the insured serves solely as a member of his or her profession;

B.   Any counterclaims in suits brought by the insured to collect fees, providing such damages are claims under any of the foregoing covered circumstances;

C.   All losses incurred by the named insured after his retirement, even though he may not have renewed this policy subsequent to his retirement, but only while he is involved in his own defense or the defense of another physician.

Dkt. # 106, Ex. 1, Physicians Liability Insurance Company Professional Liability Policy for Michael Dubriwny, M.D., at 3.  The policy specifically excluded coverage for any "injury for which the insured may be held liable as a proprieter, superintendent, officer, director or shareholder of any hospital, sanitarium, clinic with bed and board facilities, nursing home, laboratory or other business enterprise." Id.  The liability for which PLICO contracted to indemnify Dr. Dubriwny was medical malpractice arising out of his practice of "psychiatry – including child [psychiatry]." Id. at 2.  The coverage provided by PLICO was $3 million per occurrence and $3 million for the aggregate value of the policy.  Id.  In addition to any judgment entered against Dr. Dubriwny, PLICO  agreed to pay

> all expenses incurred by the Company, all costs taxed against the Insured in any suit defended by the Company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon.

Id. at 4.  This provision provides for supplementary payment of any interest "in addition to the applicable limit of liability," thus excluding interest payments from PLICO's coverage limitations. PLICO points out that its policy contains an "other insurance" clause, which states that "[i]f the insured has other insurance against a loss covered by this policy, the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the applicable limit of liability of all valid and collectible insurance against such loss." Id. at 5.

St. Paul issued a "Hospital Professional Liability Protection - Claims-Made" policy to SMI with  a $1 million policy limit for each occurrence and a $3 million aggregate policy value.[6] St. Paul has been careful to classify SMI's liability insurance policy as a "claims made" policy as opposed

---

[6]        St. Paul also issued a "Health Care Facility Comprehensive General Liability Protection" policy to SMI, but PLICO has not asserted that it has any claim under this policy.

to an "occurrence" policy.  St. Paul requires the insured to meet two requirement before the insurance policy will cover a claim.  The insured must show that "the claim is based on an act of [sic] omission that happened after the retroactive date shown in the Coverage Summary" and "the claim is first reported to us or one of our agents while this agreement is in effect."  Dkt. # 83, Ex. PP, Hospital Liability Coverage Summary, at 1.  The policy insured SMI for

> amounts you and other protected persons are legally required to compensate others for injury or death resulting from any of the following
>
> • the providing or failure to provide professional services;
>
> • the actions of any formal accreditation board of yours or any similar board of yours; or
>
> • the actions of those charged with carrying out such board or committee directives.

Id. at 5.  In a separate Medical Professional Liability Extension Endorsement, the policy was amended to insure SMI for "damages assumed under contract or agreement."  Id. at 2.  This endorsement states:

> Protection for damages assumed under contract or agreement only applies to amounts you are legally required to pay to compensate others for injury or death resulting from:
>
> • the providing or failure to provide professional services;
>
> • the actions of any formal accreditation board of yours or any similar board of yours; or
>
> • the actions of those charged with carrying out such board or committee directives.

Id.  The policy does not incorporate any specific contracts, so in order to interpret this provision it is necessary to refer to the contract which allegedly imposes liability on SMI.

There are several categories of "protected persons" covered by SMI's liability policy.  At issue in this case is coverage under the categories of "corporation" and "hospital administrator."

11

Id. at 5.  The policy states that "[i]f this policy is in the name of some other type of organization such as a corporation, its executive officers, trustees, directors and stockholders are protected while they're acting within the scope of the their duties for the named organization." Id.  The policy also covers SMI's "hospital administrator or chief executive officer . . . while acting within the scope of his or her duties for the hospital." Id.  The policy does not define the terms executive officer, director, or hospital administrator, and the meaning of these terms is central to the outcome of the case.  SMI requested optional coverage for its employees while they were acting within the scope of their duties, but this coverage specifically excluded "interns, externs, residents or dental, osteopathic or medical doctors. Id. at 6.  St. Paul's policy contains an "other insurance" clause:

> A professional liability loss that's covered under this agreement may also be covered under other insurance.  If this happens, we'll pay that portion of the loss which the limits of coverage under this agreement are of the total of all limits that apply.  But we won't pay more than the limits of coverage under this agreement.

Id.

### Alleged Bases for Coverage of Dr. Dubriwny under St. Paul's Liability Policy

PLICO has asserted several bases that it claims require St. Paul to pay its policy limits in order to satisfy its proportionate share of the Meadows' judgment.  PLICO offers several possible ways that Dr. Dubriwny may qualify as a protected person under St. Paul's hospital liability policy, such as that Dr. Dubriwny was an executive officer, director, or hospital administrator.  PLICO also claims that St. Paul agreed to insure SMI's medical director for damages assumed under contract or agreement.

12

*Was Dr. Dubriwny an Executive Officer/Director[7] under St. Paul's Policy?*

St. Paul's liability insurance policy covers SMI as a corporation and its "executive officers, trustees, directors and stockholders . . . while they're acting within the scope of their duties." However, the policy does not explicitly define who qualifies as an executive officer under the policy. The policy provision creates a two-part analysis: 1) as SMI's medical director, does the policy provide Dr. Dubriwny coverage as an executive officer; and 2) was he acting within the scope of his duties as SMI's medical director when caring for Leonard and Meadows.  PLICO argues that St. Paul has conceded that Dr. Dubriwny is an executive officer under the policy by failing to respond to the arguments raised in PLICO's motion for summary judgment (Dkt. # 39) and that St. Paul must insure Dr. Dubriwny for its share of the Meadow's judgment.  The Court rejects this argument. Although St. Paul does not contest that Dr. Dubriwny would qualify as an executive officer in his capacity as medical director, St. Paul challenges PLICO's assertion that Dr. Dubriwny was acting within the scope of his duties as medical director while treating Meadows and Leonard in his private practice.  This does not constitute an admission that St. Paul has agreed to insure Dr. Dubriwny for the Meadows' judgment and the Court will consider this issue.

The policy itself does not define the term "executive officer," so the court must consider case law and extrinsic evidence to determine whether Dr. Dubriwny is entitled to coverage on this basis. Under Oklahoma law, an insurance contract should be construed according to the terms set out

---

[7]     Although PLICO makes separate arguments for coverage as a "director" and an "executive officer," the terms are essentially indistinguishable and PLICO does not contend that Dr. Dubriwny's duties would differ under either term.  St. Paul does not dispute that Dr. Dubriwny, as medical director, could qualify for coverage under one of these terms. Therefore, the Court will consider these terms as providing a similar basis for coverage under St. Paul's policy and discuss coverage for Dr. Dubriwny only as an executive officer, in part because case law interpreting similar language in other insurance policies focuses on the term "executive officer."

within the four corners of the document. First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002); London v. Farmers Ins. Co., Inc., 63 P.3d 552, 554 (Okla. Civ. App. 2002). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2004). A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision." Wynn v. Avemco Ins. Co., 963 P.2d 572, 575 (Okla. 1998). A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation. Max True Plastering Co. v. U.S. Fidelity & Guar. Co., 912 P.2d 861, 869 (Okla. 1996). If an insurance contract contains an ambiguous term, the Court may refer to extrinsic evidence to interpret the insurance policy. Gable, Simmons & Co. v. Kerr-McGee Corp., 175 F.3d 762, 767 (10th Cir. 1999) (citing Pierce Couch Hendrickson Baysinger & Green v. Freede, 936 P.2d 906, 912 (Okla. 1997)). In this case, the insurance policy does not explicitly or implicitly offer any guidance on the interpretation of the term "executive officer," and the parties strongly disagree about the scope of Dr. Dubriwny's duties at SMI, so the Court will consider extrinsic evidence to interpret the policy language.

Based on the record, it appears that the medical director at SMI occupied an administrative position, overseeing treatment at SMI but not becoming directly involved with patient care. The medical director served on the Executive Committee, which also consisted of the Chief Administrative Officer, Chief Operations Officer, and Chief Financial Officer, and functioned as a liason between the medical staff and the Chief Executive Officer. He established standards for

medical care at the institute and participated in treatment decisions in unusually difficult cases. Dr. Dubriwny was required to review the performance of the entire clinical staff and work with the medical staff to create rules governing the treatment of patients at SMI. He had the authority to recommend termination of staff privileges and even suspend privileges before providing a hearing to the staff member. Courts that have construed the term "executive officer" in an insurance policy tend to focus on management control and authority over the operations of the business. See U.S. Fidelity & Guar. Co. v. Executive Ins. Co., 893 F.2d 517, 518-19 (2d Cir. 1990); Ohio Cas. Group of Ins. Companies v. Gray, 746 F.2d 381, 383-84 (7th Cir. 1984); Transport Indem. Co. v. Liberty Mut. Ins. Co., 620 F.2d 1368, 1374 (9th Cir. 1980). The Court finds that Dr. Dubriwny does meet the ordinarily accepted definition of the term "executive officer," but that does not automatically incorporate his private practice under the umbrella of SMI's professional hospital liability policy.

The policy provides liability insurance only when the executive officer is "acting within the scope of [his] duties for the named organization." St. Paul has not conceded, nor did SMI stipulate at the previous medical malpractice trial, that Dr. Dubriwny's private practice was within the scope of his duties as medical director. This Court finds that SMI specifically intended to exclude Dr. Dubriwny's private practice from coverage under the St. Paul policy. Even though the corporate bylaws cited by PLICO include broad language that may include limited amounts of the medical director's treatment of patients in his corporate duties, the employment agreement unequivocally excludes Dr. Dubriwny's private practice from his administrative position as medical director. PLICO repeatedly cites to the first sentence of paragraph 9 of Dr. Dubriwny's employment agreement, but willfully ignores that this paragraph shifts all legal responsibility "as an individual practitioner of psychiatry" onto Dr. Dubriwny. The facts in the record clearly show that Meadows

and Leonard were referred to Dr. Dubriwny through a patient distribution system utilized by SMI to assign each new patient to a private practitioner.  PLICO has offered no evidence that Meadows was referred to Dr. Dubriwny because he was the medical director, or that this was such a difficult case that he was overseeing the case as SMI's medical director.  It would take a strained reading of the insurance policy and the documents cited by PLICO to conclude that SMI intended to provide general malpractice insurance for its medical director.

In <u>Sherman v. Ambassador Ins. Co.</u>, 670 F.2d 251 (11th Cir. 1981), the Eleventh Circuit construed a professional hospital liability policy issued to an abortion clinic to exclude acts of medical malpractice by a private physician.  In <u>Sherman</u>, Robert J. Sherman, M.D., was employed as a gynecologist by the Columbia Family Planning Clinic, P.C.  The clinic purchased a medical malpractice insurance policy from Ambassador Insurance Company which covered administrative acts of its staff, but the clinic required each physician to maintain malpractice insurance to cover claims arising out of his own medical malpractice.  <u>Id</u>. at 256.  Dr. Sherman was notified of this distinction.  Dr. Sherman was sued for malpractice, but the plaintiff's claims specifically distinguished between medical and administrative malpractice.[8]  The Eleventh Circuit held that Ambassador did not cover Dr. Sherman for acts of medical malpractice, but did have a duty to defend and indemnify him for administrative acts or omissions.  <u>Id</u>. at 256-57.

At the malpractice trial in this case, the trial court's order on SMI's motion for summary judgment stated that SMI could be held liable only for the "purported medical negligence" of Dr.

---

[8]   The complaint listed several categories of negligence, including: "failure to provide and maintain adequately trained staff, or adequate laboratory equipment and surgical equipment," failure to obtain adequate history," and "use of unsterile equipment."  The Eleventh Circuit found that these types of allegations resembled claims of administrative negligence instead of traditional medical malpractice.

Dubriwny. Dkt. # 83, Ex. V, Order, Jan. 26, 1996, at 2. This establishes that SMI was not on trial for administrative failures, but solely for Dr. Dubriwny's own alleged medical malpractice. Even though Dr. Dubriwny qualifies as an executive officer, there is no evidence in the record that St. Paul's policy was intended to insure Dr. Dubriwny for standard medical malpractice claims arising out of his private practice. As Sherman shows, an insurance policy can differentiate between administrative and medical negligence. Dr. Dubriwny's employment agreement put him on notice that SMI was not insuring him for medical malpractice, only for administrative negligence. SMI's pretrial stipulation and the jury instructions do not change this result.[9] Therefore, the Court finds that Dr. Dubriwny is not covered under SMI's professional hospital liability policy for the Meadows' judgment on the basis that he is an executive officer, because the claim did not arise out of the scope of his administrative duties for SMI.

*Was Dr. Dubriwny a Hospital Administrator under St. Paul's Policy?*

PLICO also argues that Dr. Dubriwny is covered because he qualifies as a hospital administrator under the St. Paul policy. The policy distinguishes the term "hospital administrator" from "executive officer" by placing it in a separate policy provision, so the Court will treat these terms differently. St. Paul does not dispute that Dr. Dubriwny may qualify as a hospital administrator, but focuses its arguments on the scope of Dr. Dubriwny's duties as medical director. According to St. Paul, even if Dr. Dubriwny meets the definition of a hospital administrator, the Meadows' judgment is not covered under its insurance policy because the claim arose out of acts of medical negligence in Dr. Dubriwny's private practice of psychiatry. PLICO asserts that SMI

---

[9]     PLICO argues that the trial court admitted evidence concerning SMI corporate policies and that witnesses criticized SMI's overall treatment methodology. The mere fact that the trial court allowed the jury to hear this kind of testimony does not change the underlying theory of liability against SMI.

has admitted that Dr. Dubriwny was acting within his capacity as medical director while treating Meadows and Leonard.

St. Paul agreed to insure SMI's "hospital administrator . . . while acting within the scope of his or her duties."  Arguably, Dr. Dubriwny, in his capacity as SMI's medical director, fits within the plain meaning of the term hospital administrator.  As previously discussed, the medical director is responsible for overseeing the clinical staff, establishing operating protocols, handling matters related to staff discipline and staff privileges, and other specified administrative tasks.  SMI internal policy states that the medical director "is responsible to the Administrator for medical clinical functions and functions as a co-administrator."  Dkt. # 77, Ex. 19,  Shadow Mountain Institute Statement of Philosophy and Plan for Professional Services, at 12.  The medical director occupies a purely administrative position, supervising medical care at SMI and reporting to the hospital administration about clinical matters.  This seems to be exactly the kind of position contemplated by the term "hospital administrator" in St. Paul's policy; however, PLICO offers no support for its conclusion that Dr. Dubriwny's private practice of psychiatry falls within the scope of his duties as medical director.

PLICO continues to rely on the pretrial stipulation and the jury instructions from the malpractice trial as a concession of insurance coverage in this case.  As discussed in more detail below, this Court finds that SMI did not intend to stipulate to liability on behalf of its Dr. Dubriwny as its medical director; the narrow legal doctrine under which SMI agreed to assume liability was purely for vicarious liability for acts of medical negligence by Dr. Dubriwny.  See pages 21-23, infra.  The employment agreement specifically notifies Dr. Dubriwny that SMI does not intend to offer him blanket malpractice coverage through its hospital liability policy.  PLICO also attempts

to rely on the bylaws of the medical staff to expand the scope of the medical director's duties. Although the bylaws for the medical staff state that the medical director shall "[c]onduct or direct therapy for patients as required," the bylaws clarify that the medical director is responsible for "monitoring the quality of patient care in the Institute."  See Dkt. # 39, Ex. 18, Bylaws of the Professional Staff of Shadow Mountain Institute, at 1, 18.  There is no indication that SMI intended its medical director to occupy a hands-on role in patient care.  Consequently, PLICO's argument that Dr. Dubriwny is covered on the basis that he is a hospital administrator fails, because the undisputed facts clearly show that his private practice is outside the scope of his duties as medical director.

*Did SMI Assume Liability for Dr. Dubriwny's Actions through "Contract or Agreement"?*

PLICO argues that SMI agreed to indemnify Dr. Dubriwny for all actions arising from professional services he performed at SMI, regardless of whether it would fall within his duties as medical director.  The contracts PLICO relies on to support its argument are the employment agreement between SMI and Dr. Dubriwny hiring Dr. Dubriwny as SMI's medical director, and the stipulation to vicarious liability at trial.  St. Paul's policy states that it will "cover liability for damages assumed under contract or agreement" when SMI is required to pay for injuries to others resulting from "the providing or failure to provide professional services."  St. Paul claims that SMI specifically refused to indemnify Dr. Dubriwny for medical malpractice, and that this provision of the insurance policy does not provide a basis for coverage.

PLICO cites the following language from paragraph 9 of Dr. Dubriwny's employment agreement:

> SMI agrees that it will be legally responsible for all claims, causes of action, liabilities, attorneys fees, damages or costs of any kind arising from its own or its employees' negligent, tortuous [sic] or wrongful conduct in the establishment, operation or activities of SMI and its facilities with respect to the scope and

19

performance of the employment hereunder by the employee in the position of SMI Medical Director.

Dkt. # 39, Ex. 2, Agreement for Employment of Medical Director, at 3.  PLICO states that this language proves that SMI agreed to accept legal responsibility for any claim against Dr. Dubriwny within the scope of his employment.  St. Paul points to more detailed language in the employment agreement distinguishing Dr. Dubriwny's medical and adminstrative functions:

> The employee, Michael Dubriwny, agrees that he will be legally responsible for all claims, causes of actions, liabilities, attorneys fees, damages or costs of any kind arising from his own negligent, tortuous [sic], or wrongful performance of the services provided by him, as an individual practitioner of psychiatry, to inpatients, and outpatients not admitted to or patients of SMI, accepted by him as cases in his private practice of psychiatry, as authorized and described in Schedule A, to this Agreement.

Id. at 3.  Dr. Dubriwny agreed to assume legal responsibility for his own acts of medical malpractice arising out of his "private practice of psychiatry" and SMI required Dr. Dubriwny to obtain medical malpractice insurance for his private practice.  The undisputed facts show that he maintained a $3 million per occurrence policy with PLICO to cover claims arising out of his private practice.

PLICO's argument that SMI agreed to indemnify Dr. Dubriwny for medical malpractice is meritless, because PLICO is willfully misreading the terms of the employment agreement.  It is not possible to read the two sentences of paragraph 9 apart from one another without distorting the clear meaning of the language.  SMI agreed to indemnify Dr. Dubriwny within the scope of his duty as medical director; however, his private practice of psychiatry is specifically excluded from the indemnification clause.  In fact, it is Dr. Dubriwny who must indemnify SMI for any liability attributable to his treatment of patients at SMI.

PLICO also argues that SMI agreed to assume liability for Dr. Dubriwny's medical malpractice by stipulating in the underlying malpractice action that SMI was vicariously liable to

Meadows and Leonard.  In the malpractice action, the trial court granted SMI's motion for summary judgment on several of plaintiff's claims, but the trial court allowed plaintiff to proceed against SMI on a theory of vicarious liability.[10]  SMI appealed the trial court's decision to the Oklahoma Court of Civil Appeals and eventually to the Oklahoma Supreme Court.  Both courts affirmed the trial court's ruling on SMI's motion for summary judgment.  The Oklahoma Supreme Court stated that "what remains to be adjudicated in the cause below is Dr. Dubriwny's liability, if any, for negligence and SMI's alleged vicarious responsibility for the physician's lack of due care."  Dkt. # 83, Ex. C, Order, May 8, 2000, at 2.  SMI agreed to stipulate to vicarious liability based on the appellate rulings.

PLICO cites to the pretrial order and jury instructions from the malpractice action to support its argument that SMI stipulated that all claims against Dr. Dubriwny arose in the scope of his duties for SMI.  The Amended Pretrial Order stated that Dr. Dubriwny was an "ostensible agent of Dillon Family and Youth Services, Inc. d/b/a Shadow Mountain Institute at the time of Angie Meadows' care and treatment at Shadow Mountain Institute."[11]  Dkt. # 80, Ex. 2, Amended Pre-Trial Order, at 3.  The jury was instructed that "[t]he parties admit that Shadow Mountain Institute should be held liable for any negligence attributable to Dr. Dubriwny."  Dkt. # 39, Ex. 5, Transcript of Trial Proceedings, vol. V, at 998.  PLICO also points out that the statement of the case given to the jury included a statement that "[t]he parties admit that in 1986 Dr. Dubriwny treated Angie Meadows at

---

[10]     In its ruling on SMI's motion for summary judgment, the trial court stated that the only remaining allegations "are those against Dr. Dubriwny for his purported medical negligence and SMI's alleged vicarious responsibility."  Dkt. # 83, Ex. V, Order, Jan. 26, 1996, at 2.

[11]     This was listed as a stipulated fact in the Amended Pre-Trial Order.  When reviewing the disputed facts and legal issues left for jury determination, not a single fact or issue mentions SMI or implies that SMI could be held legally responsible for Meadows' and Leonard's injury outside of Dr. Dubriwny's alleged negligence.

Shadow Mountain Institute, where he was medical director." <u>Id</u>. at 997.  PLICO claims that Dr. Dubriwny was on trial for his acts as SMI's medical director, and cites to several parts of the trial transcript to support its argument that Dr. Dubriwny was criticized for his performance as SMI's medical director and that SMI policies led to Meadows' and Leonard's poor psychiatric treatment.[12]

In this case, St. Paul argues that PLICO is construing the scope of SMI's pretrial stipulation and the jury instructions too broadly.   St. Paul submits that the pretrial stipulation for vicarious liability did not constitute an admission by SMI that Dr. Dubriwny was acting in his capacity as medical director when he treated Meadows and Leonard.  According to St. Paul, the rulings by appellate courts limited the issues at trial to Dr. Dubriwny's medical malpractice in his role as a private practitioner and implicated SMI only under a theory of apparent agency.  SMI admitted to vicarious liability under the ostensible agency theory adopted in <u>Smith v. Saint Francis Hospital, Inc.</u>, 676 P.2d 279 (Okla. Civ. App. 1983).  In that case, the Oklahoma Court of Civil Appeals held:

> we reach the conclusion that because there was an absence of a preexisting patient-physician relationship and [the patient] looked solely to and relied upon Hospital for his treatment and was treated by medical personnel regulated and authorized by Hospital to render medical services in its emergency room, and because said personnel were placed by Hospital in a position of apparent authority to act on behalf of Hospital, Hospital is estopped from denying responsibility for the alleged negligence of its ostensible agents.

<u>Id</u>. at 282.  The critical factor for liability under this agency doctrine is the lack of a prior patient-physician relationship.  <u>Lewis v. Central Oklahoma Medical Group, Inc</u>., 998 P.2d 202, 205 (Okla. Civ. App. 1999).  Vicarious liability under <u>Smith</u> is imputed to the medical institution because the patient had a reasonable basis to believe the physician was an agent of the institution, even if the

---

[12]     PLICO asserts that patient care was part of Dr. Dubriwny's duties as medical director.  The jury was instructed that "[t]he parties admit that in 1986 Dr. Dubriwny treated Angie Meadows at Shadow Mountain Institute, where he was medical director."  Dkt. # 39, Ex. 5, Transcript of Trial Proceedings, vol. V, at 997.  However, the jury was not instructed that Dr. Dubriwny treated Meadows <u>as</u> medical director.

physician was only an independent contractor.  Smith is clear that vicarious liability in such a situation is an exception to the general rule that a hospital can only be held directly liable in a malpractice action for failing to use reasonable care when selecting a physician for its staff.  Id. at 282 (citing Darling v. Charleston Cmty. Mem'l Hosp., 211 N.E.2d 253 (Ill. 1965)).

Based upon the summary judgment record, there is no evidence that SMI intended to stipulate that Dr. Dubriwny was acting as its medical director while treating Meadows and Leonard. PLICO argues that merely by informing the jury that Dr. Dubriwny was medical director at SMI led the jury to conclude that Dr. Dubriwny was on trial in his capacity as medical director.  This overstates the significance of SMI's pretrial's stipulation and, as PLICO admits, the jury was not allowed to consider whether Dr. Dubriwny was acting as a private physician or SMI's medical director at the time of his alleged negligence.  PLICO's assertion that the "contract or agreement" provision of St. Paul's policy provides a basis for coverage is denied, as there is no evidence that SMI intended to insure Dr. Dubriwny in his capacity as a private practitioner.

### Was the Assignment of Judgment a Legal Nullity?

St. Paul argues that the assignment of judgment PLICO received from Leonard is a legal nullity, because PLICO paid the entire judgment at the time of the assignment and that such assignments are void as a matter of law.  In this case, PLICO paid the full judgment owed to Leonard and Meadows at the same time; PLICO received a release and satisfaction of judgment from Leonard and an assignment of judgment from Meadows.[13]  PLICO simultaneously entered an agreement with Dr. Dubriwny to pursue a claim against SMI and its liability insurer to collect all or part of the Meadows' judgment.  According to St. Paul, PLICO can not be a judgment creditor,

---

[13]   The judgments were actually paid by one wire transfer to plaintiffs' attorney, Oliver Howard, on December 2, 2004.

because the assignment of judgment was actually a disguised release and satisfaction of judgment. PLICO responds that it is not the judgment debtor and that the rule nullifying assignments of judgment after release and satisfaction does not apply.  PLICO also argues that St. Paul has no standing to challenge the validity of the judgment and that St. Paul is estopped from contesting the assignment as a matter of law.

Citing Greene v. Circle Insurance Company, 557 P.2d 422 (Okla. 1976), PLICO claims that an insurer that has notice of a lawsuit against its insured but fails to defend or indemnify its insured is estopped from contesting the judgment.  Greene's holding was far more limited than PLICO suggests and, in fact, the Greene court stated only that any defense that could have been raised in the underlying case can not be re-litigated in a subsequent garnishment action.  Id. at 424.  The Greene court cited the general rule that:

> One who is required either by law or contract to protect another from liability is bound by the result of the litigation to which such other is a party, provided the former had notice of such litigation and an opportunity to control its proceeding; but a judgment against a party indemnified is conclusive in a suit against his indemnitor only as to the material facts therein established.

Id. at 424 (citing United States Fidelity & Guaranty Co. v. Dawson Produce Co., 68 P.2d 105 (Okla. 1937)).  St. Paul could not have contested the validity of the assignment in the prior case for two reasons: (1) St. Paul was not a party to the previous action; and (2) the assignment of judgment did not occur until after the Meadows' judgment was final and could not have been contested in the original action.  Even if the Court were to subscribe to PLICO's broader reading of Greene, St. Paul would not be estopped from challenging the assignment of judgment because the prior action does not conclusively establish the validity of Meadows' assignment of her judgment.

24

PLICO asserts that St. Paul lacks standing to challenge the assignment because St. Paul has not shown it was prejudiced by the assignment.  However, PLICO does not cite law showing that Oklahoma has adopted this standing requirement, nor does it appear that Oklahoma would adopt the rule proposed by PLICO.  See Armstrong v. Kakish, 856 P.2d 597 (Okla. Civ. App. 1993) (allowing debtor to contest validity of assignment and declaring assignment of judgment void).  PLICO claims that St. Paul can not show prejudice because it must pay its policy limits to the holder of the judgment, whether that is Meadows or PLICO.  PLICO has not met its burden to prove that the Meadows' judgment triggered SMI's liability policy, so there is no foundation for PLICO's argument.  Even if the Court were to adopt the rule proposed by PLICO, St. Paul could very likely prove that it was prejudiced by PLICO's attempt to garnish SMI's liability policy, because Meadows would have no basis to do so.  The Court does not find that St. Paul lacks standing to contest the enforceability of the assignment of judgment held by PLICO.

St. Paul relies primarily on Armstrong for its claim that the assignment of Meadows' judgment to PLICO should extinguish the judgment, because PLICO paid the entirety of the claim in complete satisfaction of the judgment.  In Armstrong, Bank of Oklahoma ("BOk") sued E.W. Jiles, F.G. Armstrong, Allen Greer, and William Kakish for $1,678,860 as co-makers of an overdue promissory note.  The court entered judgment for the full value of the note, and Jiles, Armstrong and Greer paid BOk $1,400,000, which BOk accepted as full satisfaction of the note.  Following payment by Jiles, Armstrong, and Greer in satisfaction of the debt, BOk assigned its judgment to them and the new holders of the judgment attempted to levy against Kakish's collateral to satisfy the judgment.  The Oklahoma Court of Civil Appeals held that "when a judgment is paid in full by one under legal obligation to pay it, it should be extinguished, and should lose its force and effect

as a lien against the property." <u>Armstrong</u>, 856 P.2d at 599.  The court was clear that this standard is broader than the "primary liability" argument asserted by the assignees in <u>Armstrong</u>. <u>Id</u>. at 599; <u>Martin v. North American Car Corp.</u>, 35 P.2d 460, 462 (Okla. 1934).  The proper remedy, for one that was obligated and has fully paid a judgment, is to seek contribution from other persons or entities that should rightfully pay a portion of the judgment.  <u>Armstrong</u>, 856 P.2d at 599.

PLICO contends that this rule is inapplicable, because PLICO is not a judgment debtor and is not primarily liable for the debt.  However, this ignores the holding of <u>Armstrong</u>, which stated that Oklahoma does not apply a "primary liability" standard, as long as the person paying the judgment had a legal obligation to do so.  PLICO's argument that it is not primarily liable for the Meadows' judgment is misplaced, as this is no longer the test under Oklahoma law.  The question before this Court is whether PLICO had a legal obligation to pay the Meadows' judgment, even if that duty accrued because of Dr. Dubriwny's direct acts of negligence.  It is undisputed that PLICO had a legal obligation to pay the Meadows' judgment in full under its malpractice liability insurance policy issued to Dr. Dubriwny.  PLICO's claim that it did not intend for its payment to Meadows to constitute satisfaction of the judgment is irrelevant, because <u>Armstrong</u> does not allow this Court to consider the intent of the party paying the judgment.  The rule is simply that any judgment paid by one "under legal obligation to pay it" is extinguished as a matter of law.  <u>Armstrong</u>, 856 P.2d at 599.  The Court finds that PLICO's full payment of the Meadows' judgment extinguished the judgment and that the assignment provides no basis for PLICO to garnish St. Paul for any part of the judgment.  If PLICO has any claim to reimbursement from St. Paul, it is through a contribution action instead of a garnishment action.

### Equitable Subrogation and Equitable Contribution

Even if Dr. Dubriwny is not a covered person under SMI's liability insurance policy, PLICO claims that it is entitled to recoup all or part of its loss through equitable subrogation or equitable contribution. PLICO claims that equity and good conscience require St. Paul to pay its fair share of the judgment because PLICO has been forced to exceed its policy limits to pay a judgment for which both insurers should be responsible. St. Paul responds that PLICO has no basis to seek equitable subrogation, because PLICO is claiming the Meadows' judgment has not been paid.

Oklahoma recognizes the doctrine of equitable subrogation as a method to place the ultimate burden for discharging a debt or liability to the "person or entity who, in good conscience, ought to pay." In re Estate of MacFarline, 14 P.3d 551, 561 (Okla. 2000); Rice-Bell Partnership v. Capital Indem. Corp., 8 P.3d 189, 192 (Okla. Civ. App. 2000). In a dispute between two insurers, "a claim based on equitable subrogation allows an insurer who has paid coverage to stand in the shoes of the insured and pursue recovery from a third party primarily responsible for the insured's loss which the insurer both insured and reimbursed." United States Fidelity & Guaranty Co. v. Federated Rural Electric Ins. Co., 37 P.3d 828, 831 (Okla. 2001). There are few hard and fast rules for applying equitable subrogation, as the court must determine whether equity requires the burden of payment to be shifted based on the facts on circumstance of the particular case. Lawyers' Title Guaranty Fund v. Sanders, 571 P.2d 454, 456 (Okla. 1977).

There is a fundamental flaw in PLICO's claim for equitable subrogation which precludes application of this doctrine, even if the Court had found that St. Paul was contractually bound to insure Dr. Dubriwny for a medical malpractice judgment. PLICO has not offered any evidence that St. Paul should be treated as a primary insurer of Dr. Dubriwny for acts of medical malpractice, only

that St. Paul should be treated as a primary insurer for SMI's medical director.  The Oklahoma Supreme Court has defined primary insurance as "immediate coverage for the insured upon the occurrence of a loss or the happening of an event which, under the terms of the policy, gives rise to immediate liability." United States Fidelity & Guaranty Co., 37 P.3d at 831.  Equitable subrogation applies to apportion a loss only between two primary insurers.  Id. at 831 (holding that an excess insurer was not liable to primary insurer for defense costs); Niemeyer v. United States Fidelity & Guaranty Co., 789 P.2d 1318, 1322 (Okla. 1990) (excess insurer can seek equitable subrogation from primary insurer only when primary insurer failed to settle a claim for a mutual insured in bad faith).  A plain reading of the insurance policy shows that SMI's liability policy was intended to cover the medical director only in his capacity as a medical director.  The Court can not find, even if the two insurance policies overlap on some issues, that St. Paul's policy could reasonably be treated as a primary policy providing malpractice coverage for Dr. Dubriwny.

PLICO claims that equity and good conscience require St. Paul to pay its fair share of the judgment because PLICO has been forced to exceed its policy limits to pay a judgment for which both insurers should be held responsible.  In fact, PLICO has not exceeded its policy limits by paying the full judgment on behalf of Dr. Dubriwny.  Dr. Dubriwny's malpractice liability policy with PLICO had a $3 million per occurrence limit, exclusive of interest.  PLICO agreed to pay interest on top of any judgment within the policy limits.  The total judgment in this case was $2.7 million, so PLICO can not claim that its policy limits have been exhausted.  Even if PLICO had some entitlement to equitable subrogation, PLICO has not exceeded its policy limits and it is simply insuring a judgment it bargained with Dr. Dubriwny to pay.  There is no inequity in requiring an

28

insurer to pay a judgment it contracted to cover.  Therefore, PLICO has no basis to bring a claim for equitable subrogation.

PLICO has asserted a claim for equitable contribution, but the Court finds no basis for an equitable contribution claim in this case.  The Oklahoma Supreme Court has described equitable contribution as "the right to recover, not from a party primarily liable for the loss, but from a co-obligor or co-insurer who shares common liability with the party seeking contribution."  Id. at 832. The limitation on this doctrine is that it applies only when "co-insurers have covered the same insured and the same particular risk at the same level of coverage."  Id.  Since the Court has already determined that St. Paul has no duty to provide coverage to Dr. Dubriwny for his private medical practice, and there is no evidence to suggest that PLICO and St. Paul provided equivalent levels of coverage for the same loss, PLICO's claim for equitable contribution should be denied.[14]

**Conclusion**

Based on the summary judgment record, the Court finds that PLICO has no basis to garnish St. Paul for any part of the Meadows' judgment.  Nor is PLICO entitled to equitable contribution or equitable subrogation  because PLICO and St. Paul are not co-insurers for the loss incurred by Dr. Dubriwny, nor is there any evidence that it would be inequitable for PLICO to pay the entire judgment it bargained to insure in its contract with Dr. Dubriwny.

---

[14]     The Oklahoma Court of Civil Appeals has questioned whether the Oklahoma Supreme Court intended to adopt the theory of equitable contribution as the law in Oklahoma.  United Services Auto Ass'n v. State Farm Fire & Cas. Co., 110 P.3d 570 (Okla. Civ. App. 2004). The Court finds that even if equitable contribution were the law, it clearly does not apply to the facts of this case.

**IT IS THEREFORE ORDERED** that: the Motion for Summary Judgment by Defendant St. Paul Mercury Insurance Company and Memorandum Brief in Support (Dkt. # 82) and Motion for Summary Judgment by Garnishee St. Paul Mercury Insurance Company (Dkt. # 40) are **granted**. The Motion for Summary Judgment and Supporting Brief on Equitable Subrogation and Equitable Contribution Claims of Plaintiff Physicians Liability Insurance Company (Dkt. # 86) and the Motion for Summary Judgment and Supporting Brief of Garnishor Physicians Liability Insurance Company (Dkt. # 39) are **denied**.   The Motion in Limine and Supporting Brief of Plaintiff/Garnishor Physicians Liability Insurance Company (Dkt. # 93) and Physician Liability Insurance Company's Motion to Strike St. Paul's Reply Brief and/or Strike from the Record Exhibit EEE Thereto and Exclude Use of Said Exhibit as Evidence in Case (Dkt. # 107) are **deemed moot**.

**DATED** this 27th day of July, 2006.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT